Filed 9/22/21 In re B.S. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re B.S., a Person Coming Under the Juvenile Court Law. | B309539<br>(Los Angeles County Super. Ct. No. 20CCJP02763A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>T.S.,<br><br>        Defendant and Appellant. | |

APPEAL from orders of the Superior Court of the County of Los Angeles, Martha A. Matthews, Judge.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

## I. INTRODUCTION

T.S. (father) appeals from the juvenile court's jurisdiction and disposition orders, arguing there was insufficient evidence to support the finding that he failed to protect his son, B.S. (the child), from the potential risks posed by A.P.'s (mother) alcohol abuse. Father also contends that the court abused its discretion by ordering him to participate in an Al-Anon support group. We affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

A. *The Dependency Petition*

On May 19, 2020, the Los Angeles County Department of Children and Family Services (the Department) filed a Welfare and Institutions Code section 300[1] petition, which alleged, as relevant to this appeal and as later amended:

"b-3: [Mother] has a history of alcohol abuse and is a current abuser of alcohol, which renders [her] incapable of

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

providing regular care and supervision of the child. On prior occasions, . . . mother used, possessed, and was under the influence of alcohol while the child was in . . . mother's care and supervision. [Father] knew, or reasonably should have known, of . . . mother's alcohol abuse and failed to protect the child by allowing . . . mother to reside in the child's home and have unlimited access to the child. [M]other's substance abuse and . . . father's failure to protect the child, endangers the child's physical health and safety and places the child at risk of serious physical harm, damage, danger, and failure to protect."

B.   *Family's Prior History*

The family initially came to the attention of the Department in an August 2019 referral alleging that mother had "recently tried to hang herself," and that her boyfriend, D.G., also had attempted to hang himself twice in mother's garage. According to the referral, mother had an alcohol use disorder and had relapsed on July 27, 2019. D.G. also had a problem with alcohol. Father was "concerned about these events" and had taken custody of the child since mother went to the emergency room.

The Department's report on the incident explained that mother had ended a "toxic relationship" with D.G., who had attempted to hang himself in her bathroom and garage. The incident caused mother to relapse to alcohol abuse. Mother described herself as a "blackout drinker" and could not remember the events that resulted in her admission to the emergency room. Mother denied attempting suicide, explaining that she only told hospital personnel that she was suicidal so she could be seen

earlier. She was held for several hours because her blood alcohol content was "approximately 3.8."

Mother made arrangements for the child to stay with father after she relapsed in August 2019, but there was no present agreement as to when the child would be returned to her care. Father knew that mother had a "toxic relationship" with D.G., that she had sought a restraining order against D.G, that he had attempted suicide in her home, and that mother had relapsed as a result. Father was glad to have the child in his care because he did not want D.G. around his son. Father was also aware that D.G. was a recovering alcoholic who was "never sober." Father believed mother had purchased a rifle to protect herself from D.G. Father planned to locate and discard the rifle. Because mother had been sober for over 10 years prior to her recent relapse and she appeared to be doing well, father was hopeful that she would "get herself together," but until then he would care for the child.

Following its investigation of the August 2019 referral, the Department determined that the allegations of general neglect were "unfounded" and closed the case.

C.     *Current Referral*

On April 26, 2020, the Department received another referral alleging emotional abuse of then seven-year-old child by D.G. According to the caller, an intoxicated D.G. and mother engaged in an argument during which D.G. became irate, pulled mother's hair, and "strangled her for about [five] second[s]." Mother pushed him away and asked him to leave. D.G. left and mother locked the door, but he soon returned and broke down the

door when mother would not let him in.  Mother locked herself in the bedroom with the child and called 911, causing D.G. to leave.  The police arrived, located D.G., and arrested him.

On May 6, 2020, a social worker interviewed mother, who provided the following:  D.G. began drinking two days before the incident, telling mother that his back hurt.  On the day of the incident, the child told mother he was scared and wanted to go to father's house because D.G. was drinking.  Mother called father, but he refused to pick up the child because he was "on a date."

At around 3:00 a.m., D.G. became irritated by mother and said he would sleep on the couch, but instead continued drinking.  Mother subsequently told D.G. to leave because the child was upset.  D.G. then became angry, which prompted mother to tell him she intended to pack his belongings so that he could leave.  Instead, D.G. followed mother to her room where the child was sleeping and began yelling.  In response, mother pushed D.G., who reacted by choking her, pushing her to the ground, picking her up by her hair, and throwing her against the washing machine.

Mother took the child from the home and went to a convenience store, waiting for D.G. to leave.  While they waited, the child asked mother if D.G. "was going to kill them."  After approximately 20 minutes, mother and the child returned home, but D.G. appeared outside and began yelling for mother to let him in.  Mother told him to leave and that she was going to call the police.

At that point, D.G. "kicked the door in," and mother locked herself in her room with the child.  She called 911 and, during the call, D.G. could be heard yelling and the child could be heard

5

saying, "'He's going to kill us[.]'" The police arrived and arrested D.G.

During the interview, mother admitted that she was a recovering alcoholic and was drinking again. But she denied needing help, claiming she could stop drinking whenever she wanted.

During the social worker's interview with father, he provided the following details about the incident: At around 8:00 p.m. that night, mother called father and asked him to pick up the child who was scared because D.G. threatened to stab him with a knife. Father then spoke to the child who told him D.G. was mad, but did not provide further details, other than stating that he wanted to be picked up. Father did not "feel anything had escalated or that his son was in any harm." He again spoke to mother who assured him that everything was alright. But at around 11:00 p.m., mother texted father that "'LAPD is here it's going down.'" Because D.G. had been arrested and was no longer in the home, father believed it was appropriate to wait until the next morning to pick up the child. Father picked up the child the next morning; and mother was already drinking by the time he and the child left.

In his interview, child told the social worker that he witnessed D.G. assault mother and that he later saw the broken door to the home. The child knew D.G. was drunk during the incident, believed D.G. was going to kill them, and was scared. He also told the social worker that mother was "'crazy,'" that she had lied to father, telling him "everything was okay," and that, as a result, father did not pick him up that night.

6

On May 15, 2020, the Department sought and obtained a removal order from the juvenile court and took the child into protective custody.

At the May 22, 2020, detention hearing, the juvenile court found that the Department had made a prima facie showing under section 300, detained the child, and temporarily placed him under the supervision of the Department. The court released the child to the custody of his parents and placed him in mother's home on the condition that the maternal uncle move in with mother. The court further ordered the Department to provide family maintenance services to the child and his parents.

C. *Department's Section 385 Application*

On June 23, 2020, the Department applied ex parte for a change in court order under section 385 that sought to detain the child from mother and place him with father. According to the Department, during a visit with a social worker, the child advised that, the prior weekend, he found mother "'[p]assed out [o]n the restroom floor . . . .'" The child became scared when mother would not wake up. He had previously seen mother vomiting and observed blood in the toilet.

In a detention report filed the same day, the Department explained that on Saturday, May 30, 2020, the child was watching a movie with mother when she told him she was going to the restroom. After mother did not return, the child looked for mother in the house. Hearing running water in the restroom, the child opened the door and saw mother "'passed out'" on the floor. When the child could not wake mother, he called father using FaceTime to show her on the floor.

A social worker interviewed father about the incident and obtained the following: On the night of the incident, the child contacted him at about 10:00 p.m. "via the [iPad] crying hysterically." Father was able to view mother on the restroom floor and "'thought she was dead . . . .'" He immediately called 911 and drove to mother's home to pick up the child. When he arrived, he was relieved to see that mother "was up and awake." He asked her what happened, but she did not respond, stating only that she was feeling overwhelmed. Father gathered the child's belongings and took him to father's home.

When the social worker asked father if it appeared mother had been drinking, he responded that she "'didn't seem like she had been drinking [to] crazy excess.'" The social worker then asked if father had smelled alcohol and he replied that he "'smelled a little.'"

At the June 28, 2020, hearing on the section 385 application, the juvenile court detained the child from mother and placed him in father's care. The court granted mother weekly monitored visitation and gave the Department discretion to liberalize.

D.     *Jurisdiction/Disposition Hearing*

In an August 28, 2020, jurisdiction/disposition report, the Department advised that, according to father, he "'was not aware that [mother] was drinking to an excessive level when she had [custody of the child; he] just thought she was doing it in a control[led] manner or not drinking at all. [P]eople are allowed to drink and [it is] not illegal. [He] never thought [the child] was in danger. [He did not] think [mother] ha[d] any bad intentions.'"

8

In response to the violent incident involving D.G. that resulted in the filing of the petition, father claimed that when mother called and asked him to pick up the child, "[s]he didn't tell [him] the whole story. If [he] had known the full story [he] would have gone to get [the child]." He also claimed that he did not pick up the child later, after he knew the "full story," because the police had arrested D.G., which caused father to believe that the child was no longer in any danger.

Concerning the subsequent incident when mother passed out in the restroom, father reported that mother appeared to be under the influence of alcohol and possibly pills. He admitted he was aware of mother's alcohol consumption because she reported during family therapy to having sips of alcohol, but father did not "'see anything that raised an eyebrow.'" He denied knowing that mother had been drinking heavily until the day of the incident involving D.G.'s assault of mother. But father also admitted that he was aware that mother began drinking again in August 2019 after approximately 10 years of sobriety and that she "started getting high about March 2020."

At the December 2, 2020, jurisdiction/disposition hearing, the juvenile court sustained, among other counts, b-3. As to disposition, the court ordered, among other things, that father participate in individual counseling and attend an Al-Anon support group over father's objection.

## III.   DISCUSSION

A.   *Legal Principles and Standard of Review*

"'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them.  [Citation.]  In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'"  (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

Section 300, subdivision (b)(1) provides for juvenile court jurisdiction where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ."

At disposition, "'[t]he juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly.  . . .' [Citation.] [¶]  The . . . court may make 'all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child.' [Citations.]  . . . [¶]  . . . [¶]  [T]he . . . court is not limited to the content of the sustained petition when it considers what dispositional orders would be in the best interests of the children. [Citations.]  Instead, the court may consider the evidence as a whole." (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311.)

B.    *Analysis*

Father contends there was insufficient evidence that he failed to protect the child from mother's alcohol abuse or that there was a substantial risk that he would fail to do so in the future. We disagree. There was ample evidence showing father failed to appreciate the harmful effects of mother's relapse into alcohol abuse and did not adequately protect the child from it, conduct that supported an inference that he would continue to fail to protect in the future.

Based on the August 2019 incident during which mother became so intoxicated that she blacked out and was taken to the emergency room, father was aware she had relapsed after over 10 years of sobriety due to problems in her relationship with D.G. and that her renewed alcohol use had rendered her incapable of caring for the child. He also knew that D.G. abused alcohol, was aware of D.G.'s "toxic" relationship with mother, knew that mother had a restraining order against him, and believed she had purchased a rifle for protection. As a result, father did not want the child to be around D.G. In addition, father knew or should have known that mother's alcohol issues had not been resolved months after the August 2019 incident because she admitted in therapy that she continued sipping alcohol and he admitted she was "getting high" as of March 2020.

Notwithstanding father's knowledge of mother's ongoing alcohol issues and her dangerous relationship with D.G., father allowed the child to live with her as of April 2020, where he would be exposed to her ongoing and unresolved alcohol issues and D.G. would have unlimited access to him. On April 26, 2020, the child told mother he was afraid of D.G. because he was

11

drinking. In an effort to protect her son, mother called father to pick him up. According to father, even though mother explained that the child claimed D.G. threatened to stab him, because the child did not give father any details and mother later advised that everything was "okay," father decided not to remove the child from the home. Later that night, D.G. violently assaulted mother in the presence of the child and mother was forced to flee the home with the child, but returned, at which point D.G. kicked in the door causing the child to believe D.G. was going to kill them both.

Although mother texted father following the incident to alert him that the police were at her home, he decided to wait until the next morning to pick up the child. And, by the time father and the child left her home that morning, father knew mother was already drinking.

Approximately a month later, on May 30, 2020, the child contacted father by FaceTime and showed him that mother had passed out on the restroom floor. Father admitted that it was apparent that mother was under the influence of either alcohol or pills, but claimed that he did not see anything "that raised an eyebrow." This was sufficient evidence to support an inference that father downplayed or ignored the adverse effects of mother's alcohol abuse on a seven-year-old child, thereby exposing him to emotional trauma.

In addition, father's willingness, after the fact, to rationalize mother's troubling behavior and his own inadequate response to it also supported an inference that he would continue to minimize the danger to the child and expose him to future harm.

The evidence that supported the juvenile court's jurisdiction findings also supported the disposition order as to father.  Contrary to his assertion, the order requiring him to participate in an Al-Anon support group was reasonably related to his demonstrated lack of insight into mother's serious alcohol abuse issues and his willingness to downplay both the extent of mother's problem and his own inadequate responses to the consequences of it on the child.  The court did not abuse its discretion in ordering father to participate in an Al-Anon support group.

## IV.    DISPOSITION

The jurisdiction and disposition orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KIM, J.


We concur:


BAKER, Acting P. J.


MOOR, J.

14